1  Daniel A. Sasse (State Bar No. 236234)
       DSasse@crowell.com
2  David C. Griffith (State Bar No. 329342)
       DGriffith@crowell.com
3  Moriah E. Denton (State Bar No. 347975)
       MDenton@crowell.com
4  Crowell & Moring LLP
   3 Park Plaza, 20th Floor
5  Irvine, CA 92614
   Telephone:  949.263.8400
6  Facsimile:   949.263.8414

7

8  Attorneys for Plaintiff Chris Kluwe
   *(Additional Counsel Listed on Next Page)*

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12  CHRISTOPHER KLUWE,              | Case No. 8:25-cv-1648

13              Plaintiff,          | **COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

14       v.

15  HUNTINGTON BEACH UNION          | **JURY DEMAND**
    HIGH SCHOOL DISTRICT;
16  CAROLEE OGATA, in her individual
    and official capacities as Superintendent
17  of Huntington Beach Union High School
    District; SUSAN HENRY, in her
18  individual and official capacities as
    President of the Board of Trustees of the
19  Huntington Beach Union High School
    District; DANIEL BRYAN, in his
20  individual and official capacities as
    Assistant Superintendent, Human
21  Resources at Huntington Beach Union
    High School District; DANIEL
22  MORRIS, in his individual and official
    capacities as Principal of Edison High
23  School; EDWARD BEGANY, in his
    individual and official capacities as
24  Assistant Principal, Supervision at
    Edison High School; and CHRISTIAN
25  EPTING, an individual,

26              Defendants.

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Anne M. Brafford (State Bar No. 237574)
  AMBrafford@gmail.com
Law Practice of Anne Brafford
501 Main St., Ste F, #172
Huntington Beach, CA 92648
Telephone:  714.270.4277

Peter Eliasberg (State Bar No. 189110)
  PEliasberg@aclusocal.org
Jonathan Markovitz (State Bar No. 301767)
  jmarkovitz@aclusocal.org
ACLU Foundation of Southern California
1313 W 8th St, Suite 200
Los Angeles, CA 90017
Telephone:  213.977.5228
Facsimile:  213.207.7881

The ACLU Foundation of Southern California
is co-counsel for Plaintiff Kluwe only with
respect to his First-Third Causes of Action
asserted against the HBUHSD Defendants

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a).

**INTRODUCTION**

1.      Plaintiff Chris Kluwe is a well-qualified, well-liked football coach and long-time civil rights activist who was fired from his coaching job at Edison High School (EHS) for criticizing MAGA as an anti-democracy movement. He was then publicly defamed by the School District's unprecedented issuance of a press release announcing a false, highly offensive basis for his discharge.

2.      As a former professional punter for the Minnesota Vikings, UCLA all-conference scholar athlete, and Orange County high school football star, Kluwe was well-qualified for his coaching job at EHS. He performed successfully, as reflected by EHS's invitation for him to return year after year since the 2019 football season.

3.      Despite Kluwe's positive history with the team, EHS fired him on February 27, 2025, without warning.

4.      Kluwe was fired only nine days after speaking at a Huntington Beach City Council meeting to protest the proposed installation of a plaque venerating "MAGA" (referring to President Donald Trump's divisive "Make America Great Again" slogan) at the local library. His protest received significant media attention.

5.      In Kluwe's termination meeting, Defendant Ed Begany told him that the school was "getting too much attention" and they had to let him go.

6.      After Kluwe publicly assigned blame for his discharge to political pressure from MAGA—saying this is "what MAGA does to communities" and "only care[s] about trying to hurt people"—a firestorm of criticism erupted that accused the School District of unlawfully firing Kluwe.

7.      On February 28, a U.S. Congressman sent a letter of inquiry to the School District about the basis for Kluwe's discharge.

8.      In response, on March 3, 2025, the School District issued a defamatory press release about Kluwe to all EHS students, parents, and staff as well as media outlets. It purported to "clarify" that Kluwe had been discharged, not for his

political protest at the City Council meeting on February 18, but for promoting violence in a social media post on February 23.

9.    In the social media post at issue, Kluwe had encouraged people not to "review bomb" the librarians to complain about the planned installation of the MAGA plaque at the library. Kluwe encouraged people to, instead, direct their messages of disapproval to the responsible City Council members by finding out where they work and "blowing up" their phone lines with complaints.

10.    Because Kluwe's post technically used the phrase "blow up," the School District claims he promoted violence in violation of its "standards for professionalism and appropriate conduct" (which Kluwe has never seen), which justified firing him with no warning.

11.    Rather than responsibly investigating what unmistakably involved First Amendment-protected speech about a hotly-debated political issue in the community, the School District played a politically-motivated game of "gotcha."

12.    The School District's sham decision-making process did not even include notifying Kluwe of an issue with his post, disclosing the School District policy he allegedly violated, and asking for his side of the story.

13.    With any level of investigation, the School District would have discovered that a group of politically-motivated MAGA loyalists had launched a campaign to "cancel" Kluwe—i.e., to get him fired because his liberal politics and calls for him to run for City Council disgusted them.

14.    Defendant Christian Epting instigated the mob mentality that triggered the string of events leading to Kluwe' discharge.

15.    Epting did so first by altering the social media post at issue in a way that made it susceptible to an interpretation of promoting violence. He then transferred Kluwe's now-altered post from a platform friendly to Kluwe (the Democratic-leaning Bluesky) to a hostile audience in a MAGA-dominated Facebook group focused on Huntington Beach politics.

16.     Mimicking a pattern of prior hit jobs, Epting then encouraged group members to amplify the notion that Kluwe is violent and unfit to be a high school football coach or City Council member.

17.     Despite an utter lack of fair process or genuine effort to understand the truth, the School District's March 3rd press release attached the version of Kluwe's social media post that Epting had altered and repeated the political propaganda that Kluwe had promoted violence.

18.     The press release also said that Kluwe "has not acknowledged that the post was the reason for his separation from the school." This assertion falsely implied that the School District had previously notified Kluwe that the post was the reason for his discharge and that *he* had lied when publicly accusing the School District of firing him because of his protected speech at the City Council meeting.

19.     Kluwe was shocked when he saw the defamatory, dishonest press release—which also had been sent directly to his child, an EHS student.

20.     He was sickened by how the press release would impact his family and by having his long-standing emphasis on ***peaceful*** activism damaged so maliciously by what appears to be a politically-motivated hit job.

21.     Kluwe is not just a football coach and activist but also a husband and a father of two children.

22.     As to his children, the School District's reckless conduct designed to suppress and punish their father's First Amendment speech not only caused them pain and suffering but also damaged their respect for, and trust in, school leadership. As a result, Kluwe's older child has decided not to return to EHS next year, and his younger child has decided to start high school elsewhere.

23.     This case seeks to vindicate the fundamental constitutional rights of Plaintiff Chris Kluwe. It is a civil rights action brought pursuant to the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. It challenges the unconstitutional acts of Defendant Huntington Beach Union High

School District (HBUHSD) and Defendants Caroleen Ogata, Susan Henry, Daniel Morris, Dan Bryan, and Ed Begany in their individual and official capacities with the HBUHSD (collectively referred to below as the "HBUHSD Individual Defendants" when referring only to the school officials and "HBUHSD Defendants" when referring collectively to the school district and the school officials).

24.     This case also challenges the defamatory statements made by Defendant Christian Epting on which the HBUHSD Defendants relied to justify firing Kluwe.

### JURISDICTION AND VENUE

25.     This action arises under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. A single cause of action against Defendant Epting arises under California state law.

26.     Kluwe's requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and the general legal and equitable powers of this Court.

27.     This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

28.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because at least one of the Defendants resides in this District, and because all Defendants are residents of the State of California.

29.     Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Kluwe's claims occurred in Orange County, California, which is located in the Southern Division of the Central District of California.

## **THE PARTIES**

**Plaintiff**

30.     Plaintiff Christopher Kluwe is a citizen of the United States and a 15-year resident of Huntington Beach, California. He grew up in nearby Seal Beach and attended Los Alamitos High School before playing college football for the University of California at Los Angeles (UCLA) Bruins and then moving on to the NFL. For six seasons (2019-2024), Kluwe successfully performed his job as an assistant coach for the freshman football team at EHS in Huntington Beach.

**Defendants**

31.     **Defendant HBUHSD** is a school district that comprises six comprehensive high schools in Huntington Beach, including EHS.[1] HBUHSD was Kluwe's employer.

32.     Under 42 U.S.C. §1983, HBUHSD is liable for unlawful acts committed, ratified, or permitted with deliberate indifference by School District officials with final decision-making authority, including the Superintendent and Board of Trustees, and for unlawfully applying the "standards for professionalism and appropriate conduct" to violate Kluwe's First and Fourteenth Amendment rights. *See Lytle v. Carl,* 382 F.3d 978 (9th Cir. 2004); *Christie v. Iopa*, 176 F.3d 1231, 1235-1237 (9th Cir. 1999).

33.     **Defendant Carolee Ogata** is the Superintendent of HBUHSD. She is sued in her official and individual capacities. Ogata became Superintendent

---

[1] Due to some unique aspects of California law, the Ninth Circuit's decision in *Belanger v. Madera Unified School District*, 963 F.2d 248 (9th Cir. 1992) held that California school districts are considered state entities for Eleventh Amendment immunity purposes—and thus not subject to suit in federal court. For the same reason, courts have held that California school districts are not "persons" within the meaning of 42 U.S.C. §1983. *Kirchmann v. Lake Elsinore Unified School Dist.*, 83 Cal. App. 4th 1098 (2000). However, in *K. J. v. Jackson*, 127 F.4th 1239, 1251 n.8 (9th Cir. 2025) and *Riley's American Heritage Farms v. Elasser*, No. 23-55516, 2024 WL 1756101, n.1 (9th Cir. Apr. 24, 2024), the Ninth Circuit has indicated that *Belanger'*s conclusion should be revisited in light of its recent decision in *Kohn v. State Bar of Cal.*, 87 F.4th 1021 (9th Cir. 2023) (en banc). Therefore, the HBUHSD is properly included as a defendant so that the Court can determine this issue.

effective September 2024 and, before that, had served as HBUHSD's Deputy Superintendent of Human Resources since 2012.

34.     As Superintendent, Ogata acts as Chief Executive Officer of the Board of Trustees of HBUHSD and is "charged with implementing the policies of the Board." (HBUHSD Board Policies 9000, 9002). She has the ultimate decision-making authority for staff employment decisions.

35.     Upon information and belief, after a reasonable opportunity for further investigation or discovery, Plaintiff likely will have evidentiary support that Ogata was personally involved in the decision to discharge Kluwe and to publish the defamatory press release on March 3, 2025, which expressly stated that it was issued by the "Huntington Beach Union High School District (HBUHSD) and Edison High School[.]"

36.     **Defendant Susan Henry** is the President of the Board of Trustees of HBUHSD and has been a Board member since 2000. She is sued in her official and individual capacities.

37.     The Board's governance functions over the HBUHSD include responsibility for employing and managing personnel.

38.     The Board is responsible for prescribing its own governing rules. It has authorized the Superintendent to develop rules that carry out Board policy and has delegated its administrative authority to her, but it remains responsible for the conduct of HBUHSD's affairs (HBUHSD Board Policies 9000, 9313).

39.     Upon information and belief, Henry was personally involved in the decision to discharge Kluwe and to publish the defamatory press release issued by the HBUHSD and EHS on March 3, 2025.

40.     **Defendant Daniel Bryan** is the Assistant Superintendent, Human Resources at HBUHSD. He is sued in his official and individual capacities.

41.     Bryan is responsible for developing, interpreting, and recommending application of HBUHSD policies. An HBUHSD policy—the standards for

professionalism and appropriate conduct contained in a Civility Policy—was relied upon to discharge Kluwe.

42.    Upon information and belief, Bryan was personally involved in the decision to discharge Kluwe and to issue the defamatory press release from HBUHSD and EHS on March 3, 2025.

43.    **Defendant Daniel Morris** is the Principal of EHS. He is sued in his official and individual capacities. Morris was hired at EHS in 2023.

44.    For the prior eight years, Morris had been the Principal at Huntington Beach High School—another HBUHSD high school. As EHS Principal, Morris oversees all aspects of the school's operations, including supervising school staff and recommending employment and dismissal.

45.    Upon information and belief, Morris was personally involved in the decision to discharge Kluwe and to issue the defamatory press release from HBUHSD and EHS on March 3, 2025.

46.    **Defendant Edward Begany** is the Assistant Principal, Supervision at EHS. In his role, he assists the Principal in his responsibilities, including staff management and administering the EHS athletic program.

47.    Begany informed Kluwe of his termination at a meeting on February 27, 2025 and, upon information and belief, contributed to that decision.

48.    **Defendant Christian Epting**, an individual, is a former long-time resident of Huntington Beach who currently resides in nearby Long Beach.

49.    Epting is well-known in the Huntington Beach community. He has authored more than 40 books, some of them on local topics; produces a program (*Hidden Huntington Beach*) for the city's cable television channel; and periodically speaks at local events.

50.    Epting previously had local newspaper columns called *In the Pipeline* (published in the *Huntington Beach Independent*—a now-defunct *Los Angeles Times* newspaper) and *Epting's World* (published in the conservative-leaning *The*

*Local News,* owned by disgraced former Republican mayor Dave Garofalo).

<u>**FACTUAL ALLEGATIONS**</u>

**Kluwe Is a Highly-Qualified, Well-Liked Football Coach**

51.     Starting with the 2019 football season, Kluwe was hired by HBUHSD to be an assistant coach for EHS's freshman football team.

52.     Kluwe returned as a paid assistant coach each year through the 2024 season. The EHS football program invited Kluwe to return year after year due to his impressive background and excellent performance as a coach.

53.     Kluwe's former career as a punter in the NFL gave him unique credentials that appealed to both coaches and players.

54.     Kluwe is best known for his eight seasons with the Minnesota Vikings, where he set multiple individual team records.

55.     Kluwe also is well-known in Southern California for his time playing college football for UCLA. He received All Pac-10 honors, was a finalist for the Ray Guy award (awarded to the top college punter), and set records as a high school football player in Orange County.

56.     In Kluwe's coach role at EHS, he focused on football and never had teaching duties at EHS. EHS categorized Kluwe as an "expert assignment specialist" employed on a seasonal basis for a specific project and, therefore, he was not part of the classified service or certificated staff.

57.     Kluwe had no job functions within the school administration and rarely interacted with administrative personnel or parents. He interacted primarily with other football coaches and players during the football season, which typically lasted from July-November.

58.     Kluwe had never been disciplined in his coaching role, and his ability to work effectively with coaches and football players had never been criticized.

59.     The process by which the EHS inquired with Kluwe about his continued interest in coaching was informal. Each year, typically in the Spring,

Kluwe spoke to Jeff Grady (Head Coach of the EHS football program since 2017) and the Freshman Head Coach—currently Shaun Colamonico (since 2020)—about his continued interest in coaching.

60.     For the 2025 football season, Kluwe saw Grady and Colamonico at a football skills camp held at EHS in February 2025. Both asked Kluwe if he planned to return for the 2025 season and appeared pleased when he said yes.

61.     Kluwe believes that the only written employment agreement he received for his EHS coaching role was for the 2019 football season—the first year he coached.

62.     Kluwe does not recall completing new-hire paperwork or receiving a new employment agreement each year. Upon information and belief, he continuously remained on the HBUHSD payroll from 2019 until his discharge in February 2025.

63.     During Kluwe's employment with HBUHSD, he received only a limited number of personnel documents. Kluwe does not recall ever seeing a policy called "standards for professionalism and appropriate conduct."

**Kluwe is a Well-Established Civil Rights Activist**

64.     Kluwe has a long history as an advocate for civil rights and standing up for marginalized people, especially members of the LGBTQ community.

65.     For example, in 2012-2013, Kluwe's vocal support of marriage equality was widely reported in the national media.

66.     His high-profile activities included multiple published letters supporting marriage equality; an appearance in a documentary called *The Last Barrier* in which he spoke about equality in sports; submitting an amicus brief in *Hollingsworth v. Perry* to support the challenge to California Proposition 8 (which proposed to ban same-sex marriage); and an appearance on *The Ellen DeGeneres Show* to discuss his support of marriage equality.

67.     Kluwe's advocacy for marriage equality and gay rights led to tension

between him and the Vikings coaching staff.

68.     Additionally, Kluwe complained that a Vikings special teams coach had made homophobic remarks, after which the Vikings released Kluwe—which Kluwe contested as retaliatory. In 2014, Kluwe and the Vikings settled the dispute for an undisclosed donation to organizations serving LGBTQ causes. Kluwe retired from professional football in 2013.

69.     As described below, Kluwe has continued his political activity in support of civil rights as a Huntington Beach resident.

**Huntington Beach is Notorious for Its Contentious Political Climate**

70.     Since 2022, the Republican-dominated Huntington Beach City Council has embroiled itself in controversy and lawsuits due to its preoccupation with attention-getting culture war issues.

71.     Their activities have included politically divisive issues like enacting new voter ID laws, refusing to implement state housing mandates, regulating flags on city property to ban Pride flags, prohibiting COVID-related mask and vaccination mandates, removing references to hate crimes from the city's declaration on human dignity, recognizing the "genetic differences between male and female," and continually attacking the independence of the city library.

72.     Former Republican City Council member Tony Strickland referred to Huntington Beach politics as "a blood sport." *See* Daniel Trotta, *Surf City USA Now on the Frontlines of Trump-era Politics* (Feb. 15, 2024), Reuters.com, https://www.reuters.com/world/us/surf-city-usa-now-frontlines-trump-era-politics-2024-02-14/).

73.     Political polarization in the Huntington Beach community intensified further after the November 2024 elections, which resulted in all seven City Council seats being held by Trump-supporting political conservatives.

74.     Exacerbating the deepening divide, the newly-constituted City Council flaunted its allegiance to President Donald Trump's divisive *Make America Great*

*Again* (MAGA) slogan and ideology by gathering for a photo in which they all donned the hallmark red cap. *See* Ex. 1. The photo circulated widely in local and national media and social media.

75.     Central to this lawsuit is the City Council's targeting of the Huntington Beach library.

76.     In line with national efforts by political conservatives to restrict access to books, the MAGA-dominated Huntington Beach City Council has sought to reduce accessibility by teens to disfavored books (especially with puberty and LGBTQ themes); install a review board to approve books; and privatize the library to eliminate public transparency and influence.

**Ex. 1**: Photo of Huntington Beach City Council in MAGA caps.



Huntington Beach council members Butch Twining, Don Kennedy, Pat Burns, Chad Williams, Gracey Van Der Mark, Casey McKeon, Tony Strickland, and city attorney Michael Gates donned 'Make Huntington Beach Great Again' hats during the council's swearing-in ceremony in December. (Joe Katchka)

77.     Many articles have been published about Huntington Beach library politics in the *Los Angeles Times*, the *Orange County Register*, and other media outlets.

78.     The library-related issues have been hotly contested and the source of significant community attention and tension.

79.     Amid this already broiling controversy, the City Council did more: It

decided in February 2025 to commemorate the 50th anniversary of the city's central public library by proposing to install a plaque that describes the library as follows: **M**agical **A**lluring **G**alvanizing **A**dventurous. The design was intended as an acrostic to reference MAGA.

80.    The City Council's proposal of the MAGA plaque caused an uproar among many liberal and anti-Trump Republican residents and threw Huntington Beach into the national spotlight.

**The History and Reputation of Defendant Chris Epting and the MAGA-Dominated Community Discourse**

81.    Huntington Beach's politically partisan, contentious climate—including about the MAGA plaque proposal—is evident in multiple Facebook groups created for politically-engaged Huntington Beach residents.

82.    Examples of the Facebook forums most relevant to this lawsuit are the Huntington Beach Community Forum (HBCF, created in 2014; dominated by conservative/MAGA voices), Huntington Beach Community Forum 2.0 (HBCF2, formed in 2015 by liberals seeking refuge from the ultra-conservative HBCF), Huntington Beach (HB) Insider (formed in 2015 with a name change in 2019; conservative-leaning and dominated by conservative voices), and Huntington Beach (HB) CommUNITY Voice (formed in 2015; includes more mixed perspectives).

83.    For many years, when he was not banned for inappropriate comments, Epting has posted in the Facebook forums. He posts most frequently in the more conservative-leaning groups. [2]

84.    Epting is well-known in Huntington Beach for his conservative political activities and personal controversies.

85.    For example, in the 2015-2018 time-frame, Epting had high-profile

_____

[2] Printouts, screenshots, and quotations from some of the key social media posts at issue in this case are included as part of the Complaint. The Facebook groups in which the posts were published have existed for years, and posts from Epting and others reference information indicating the authenticity of the posts—i.e., that Defendant Epting is the author of posts attributed to him.

disputes with progressive voices, like Gina Clayton-Tarvin (Ocean View School District (OVSD) Board of Trustees), John Briscoe (OVSD Board of Trustees), Gustavo Arellano (*OC Weekly* columnist), and Oscar Rodriguez (co-founder of Oak View ComUNIDAD), among others.

86.    In 2016, *OC Weekly*—a liberal-leaning Orange County newspaper—named Epting #23 on its list of "scariest people." *See* Gustavo Arellano, *OC's Scariest People 2016* (Oct. 27, 2016), https://www.ocweekly.com/ocs-scariest-people-2016-tony-rackauckas-pedophiles-and-trump-fans-galore-7621559-2/.

87.    In more recent years since starting to produce the *Hidden HB* cable show, Epting appears to have made efforts to reduce his involvement in high-profile, partisan feuds.

88.    Despite his reputation-laundering efforts, Epting is still known in the community (especially among liberals) for his partisan politics and behaviors.

89.    For example, an announcement on the City of Huntington Beach – Government Facebook page of an event at which Epting would be speaking in January 2025 prompted a partisan spat about Epting. *See* Ex. 2.

90.    In the discussion thread, one critic said, "[G]et him on a bad night on FB and you'll see how ruthless he is. He attacks and attacks and threatens. Out of control!!!"

91.    Another said Epting imposed his "wrath" on her after she disagreed with him by getting "his buddy's to gang up on me on social media."

92.    One described Epting as politically partisan and incapable of neutrality.

93.    Another said Epting's "misbehaviors" were "widely known and widely reported."

94.    Others described Epting as "mean and nasty" of making "hostile comments," and of "contacting people's employment about what they say on FB."

95.    Others in the discussion thread were complimentary of Epting.

96.    Epting's allies—including Denise Kavanaugh, Craig Frampton, and Kevin Anderson—picked apart his critics, calling them liars, "mentally unstable," "HB liberal progressive nuts," "elitist liberal white leftists," and as displaying "TDS" [Trump Derangement Syndrome], among other things.

97.    Although many conservative members of the HB Facebook forums are known for actively (often aggressively) trolling liberals, some of the most prominent are Chris Young and Kavanaugh.

98.    They are known among those who are politically-engaged in the HB community as either politically conservative, alt-right, or MAGA loyalists.

99.    Whatever Epting's, Young's, and Kavanaugh's true character and beliefs, they are known in the community as partisan mischief-makers.

100.    The highly-partisan culture in the HB Facebook forums they frequent also is well-known among politically engaged people in Huntington Beach.

101.    The result is that any reasonable person should have seriously questioned the reliability of disparaging information coming from this group about a politically liberal Huntington Beach activist in February 2025.

**February 18, 2025: Kluwe Protests the City Council's Proposed Installation of a MAGA Plaque at the Huntington Beach Library**

102.    The City Council's vote on the MAGA plaque was set for a meeting on Tuesday, February 18, 2025. Kluwe registered to speak to voice his objection.

103.    Kluwe's prior experience with the Library Commission and City Council had led him to conclude that the City Council was not listening to objections about the library and other unpopular MAGA agenda items. He decided it was important to mount an impactful protest to pressure the City Council to listen to residents.

104.    Kluwe prepared a script to use at the meeting, which he edited down to fit his 1-minute speaking slot as follows:

Hello, my name is Chris Kluwe; I'm a 15 year HB resident. I'm here

to speak out against both the plaque and the current city council.

As the community made clear at the Library Commission meeting last Tuesday, everyone is in favor of a plaque to celebrate the library, but the vast, VAST majority are against including a MAGA acrostic.

Unfortunately, it's clear that this council does not listen. So instead, I'm going to take my time to say what MAGA has stood for these past three weeks.

MAGA stands for trying to erase trans people from existence.

MAGA stands for resegregation and racism.

MAGA stands for censorship and book bans.

MAGA stands for firing air traffic controllers while planes are crashing.

MAGA stands for firing the people overseeing our nuclear arsenal. MAGA stands for firing military veterans and those serving them at the VA, including canceling research on veteran suicide. MAGA stands for cutting funds to education, including for disabled children.

MAGA is profoundly corrupt, unmistakably anti-democracy, and, most importantly, MAGA is explicitly a Nazi movement. You may have replaced a swastika with a red hat, but that is what it is.

105.  After reading his script, Kluwe said, "I will now engage in the time-honored American tradition of peaceful, civil disobedience."

106.  He then walked around his podium and took a few steps toward the City Council members, who were seated on a dais behind desks. He stopped, put his hands behind his back, and was immediately tackled by five officers.

107.  Kluwe did not resist, was carried out, and was arrested.

108.  Multiple videos of the incident were posted online, including one by ABC. *See* Ex. 3.

109.  Kluwe was booked under Cal. Penal Code § 403 for a misdemeanor

disturbance of an assembly without violence or use of force.

110.   Rather than filing formal charges against Kluwe, the Orange County District Attorney's Office referred the matter to a diversionary program that, if successfully completed, will conclude the matter without charges.

**February 19-20, 2025: Partisan Reactions to Kluwe's Protest**

111.   Kluwe's protest and arrest on February 18 received significant media attention. Many major news outlets published a story or interviewed him including, for example, LA Times, OC Register, The New York Times, Sports Illustrated, CBS, NBC, ABC, Fox News, CNN, and MSNBC.

112.   The story was also the topic of discussion on many social media platforms, including the politically-oriented HB Facebook forums.

113.   Many liberal members of these forums hailed Kluwe as a hero who stood up for an important community issue. Some called for him to run for City Council.

114.   Conservative voices on the Facebook forums harshly criticized Kluwe's speech and called him (and people who admired him) disparaging names.

115.   Some who were hostile to Kluwe's speech and progressive politics referred to his peaceful protest as "rushing the dais," "violence," and "threatening."

116.   These characterizations are patently false based on any reasonable review of the video footage that is available from multiple sources.

117.   For example, on February 19, Denise Kavanaugh published a post on the conservative HBCF, which received 231 comments. *See* Ex. 4.

118.   In her post, Kavanaugh said that, while claiming to protect the library from attack, HB community members:

applaud a speaker screaming Nazi at the podium who then rushed the council members at the Dias [sic]. This is what half of our community has devolved into, base line thuggery and condoning it. Ex. 4.

119.   Kavanaugh attached 11 screenshots of posts from the Facebook page

of liberal-leaning Protect Huntington Beach (HB, a grassroots citizens' group focusing on local issues, especially the library controversy) in which members praised Kluwe. Comments said, for example, "That was an incredibly insightful speech," "This man is a patriot and is showing us what we have to do," "Peaceful disobedience…does this guy need bail money? I am here for him! He was smart and articulate, I hope he consider running for city council!"

120.    Epting added a comment to Kavanaugh's HBCF post in which he referred to Kluwe as threatening and suggested he was lucky to be alive. Ex. 5.

121.    In another comment, Epting mocked the idea of Kluwe as a candidate for City Council, saying: "And now many of them are saying they want him to run for city Council, without any apparent irony." Ex. 6.

***Ex. 5***: Screenshot of a post on HBCF by Epting on February 19 at 9:47 am.



***Ex. 6***: Screenshot of a post on HBCF by Epting on February 19 at 2:55 pm.



122.    Also on February 19, Kluwe posted the following on Bluesky:

I appreciate everyone's messages of support, I'm trying to get through all my mentions but as you can imagine, it's been a bit of a busy day :) Remember **- peaceful civil disobedience**, and no kings, no tyrants. Not ever.

*See* Ex. 7 (emphasis added).

123.    Kluwe's post received nearly three thousand comments that appear nearly universally positive and over fifty-five thousand "likes."

**February 23, 2025: Kluwe Posts on Bluesky Asking People to Stop Review Bombing the Library About the MAGA Plaque**

124.    After the high-profile City Council meeting about the planned MAGA plaque at the library, people began calling the library to complain. They blamed the librarians for the decision about the MAGA plaque and called them names.

125.    A representative of the library contacted Pride at the Pier (a non-profit supporting the LGBTQ community in Orange County) to ask if the organization could help clarify the issue so that people would stop these calls.

126.    In an effort to curb the attacks on the librarians, Kanan Durham, Executive Director of Pride at the Pier, invited Kluwe to record a video for social media. A representative of Protect HB also participated.

127.    In the video, Durham asked residents to stop "review bombing" the library because the library staff was not responsible for the MAGA plaque.

128.    For his part, Kluwe said: "If you want to do something, find out where the council members work, go review bomb that."

129.    The online Merriam-Webster Dictionary defines "review bomb" as follows: "To post a usually negative online review of (a product, business, etc.) especially as part of a coordinated campaign."

130.    On February 23, 2025, Pride at the Pier published a post on Bluesky that attached the video along with this message:

We've heard that the HB librarians are getting attacked over the MAGA plaque. Please don't do this! They are not in control of what the HB City Council does. If you care about this issue, please direct your concerns to the council members. *See* Ex. 8.

131.    Kluwe's social media activity is primarily on Bluesky. He has not engaged on Facebook, Instagram, or X in many years.

132.   Bluesky is a new, liberal-leaning social media platform that opened registrations to the general public in February 2024. It grew exponentially in the Fall of 2024 as large numbers of liberals migrated away from the X platform, known formerly as Twitter.

133.   On Bluesky, a "quote post" is a feature that allows users to share someone else's content while adding their own text or commentary.

134.   On February 23, 2025, on Bluesky, Kluwe quote posted Pride at the Pier's original post of February 23—which included Pride at the Pier's message and video asking people to stop review bombing the library. *See* Exs. 15-16.

135.   Kluwe added the following message to the quote post (referred to below as **the "PSA post"**):

> Also, PSA, and I can't believe I have to say this: Stop fucking with the library. That's what the city council is doing. The library is great, as are the people who work there. Go fuck with the city council. Find where they work, and blow *those* places up.

136.   The online Merriam-Webster Dictionary gives multiple definitions of "blow up," including "to overwhelm (something, such as a phone) with calls, messages, alerts, etc."

**February 23-25: Epting Scours the Internet for Information to Smear Kluwe**

137.   In the conservative-leaning HB Insider and HBCF Facebook groups, the criticisms of Kluwe's protest at the City Council meeting continued for days, with Epting as an active participant.

138.   For example, on February 23, 2025, at 5:49 pm, Epting published a lengthy, 330-word post on HB Insider reflecting that he was monitoring Kluwe and seeking to discredit him. *See* Ex. 9. Epting's post said, in part:

> [I]n defense of HB…Ex NFL punter Chris Kluwe has been talking lots of HB history since his arrest at HBCC meeting the other night - and apparently Building quite a little fan club here of people who strongly support both his

ideas and methods. Hey, it's a free country. You can't physically approach city Council but you can spew whatever you like from the podium."

139.   Epting's post continued, saying he had listened to a podcast that interviewed Kluwe. Epting disagreed with remarks Kluwe had made about the history of Nazis in Huntington Beach.

140.   Epting's post ended with a suggestion that Kluwe is not fit to run for City Council because Kluwe believes that Huntington Beach has a Nazi problem:

Again, he's completely entitled to that point of view (and that is a direct quote) but I also think it's worth noting, especially as his Fanbase grows locally, with some even calling for him to run for city Council – He basically thinks HB has been taken over by "nazis" Facts matter. Ideas matter. Decide for yourself.

141.   Epting actively engaged with this post, commenting on it 18 times. He repeatedly mischaracterized Kluwe's statements, pushed for Protect HB and other members of Kluwe's "fan club" to drop him as their "hero," and cast him as an extremist not fit to run for City Council. *See* Ex. 9.

142.   For example, on February 25 at 8:34 am, Epting posted a comment, saying "Hey not all heroes wear capes." *See* Ex. 10. The comment appears to be a sarcastic reference to a slogan that some had been using to refer to Kluwe in the more liberal social media forums.

143.   To this comment, Epting attached a screen shot of an excerpt from a Daily Kos article that appeared to quote Kluwe saying he drinks his own pee.

144.   But, foreshadowing what was to come, Epting had taken it out of context. The Daily Kos article to which Epting referred was published on February 24, 2025. *See* Alix Breeden, *Ex NFL Star Chris Kluwe Warns About Social Media's Sway On Young Men* (Feb. 24, 2025), Dailykos.com, https://www.dailykos.com/stories/2025/2/24/2305938/-Ex-NFL-star-Chris-Kluwe-warns-about-social-media-s-sway-on-young-men.

145.   The article referred to a prank post that Kluwe published on Twitter in 2022 while impersonating Elon Musk—to demonstrate the ease with which Twitter users could be impersonated and to embarrass Musk. *See* Ex. 11.

**February 26, 2025: Epting Tampers With Kluwe's PSA Post**

146.   On February 26, 2025 at 8:01 am PT, Epting posted again in the comments section of his HB Insider post of February 23. Epting attached an image without comment that appears to be a screenshot of a cropped version of Kluwe's PSA post that Kluwe originally published on Bluesky on February 23. *See* Ex. 12.

***Ex. 12:*** *Social media post by Epting on February 26 at 8:01 am on HB Insider.*



147.   Epting's post prompted several responses.

148.   About 90-minutes later, at 9:24 am PT on February 26, 2005, Epting published a new, original post on HB Insider that received 122 comments. *See* Ex. 13 (printout of full discussion thread).

149.   Epting attached the same screenshot that appears to be a cropped version of Kluwe's PSA post. This time, Epting added a short message to his post: "I hope the library renounces this kind of language and behavior."

150.   By creating a new, original post on HB Insider, Epting made the cropped image of the PSA post more visible to group members than if he had only left the image in the comments of his prior post.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

151.   By adding a critical remark about the need to "renounce this kind of language and behavior," Epting encouraged people to interpret the post as representing a real threat that needed to be taken seriously and addressed.

152.   Below is a side-by-side comparison of the image Kluwe originally posted on Bluesky and the post published by Epting on HB Insider Facebook group.



153.   The image in the left-hand column was posted by Epting on February 26 at 9:24 am PT on HB Insider. *See* Ex. 14 (screenshot).

154.   The image in the right-hand column is a depiction of how Kluwe's PSA post originally appeared on February 23 on Bluesky. *See* Exs. 15 (screenshot)

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS;
CASE NO. 8:25-CV-1648

CROWELL
& MORING LLP
ATTORNEYS AT LAW

& 16 (full discussion thread).

155.   As averred below, Kluwe deleted his original Bluesky PSA post due to blowback caused by Epting's Facebook post. Kluwe recreated his deleted post in a new Bluesky post on May 9, 2025, which is the version that appears above.

156.   In the top right-hand corner of Epting's cropped image is the term "2d." On the Bluesky platform, this represents the number of days since the original post. It means that the screenshot was taken two days after Kluwe posted it on Bluesky (i.e., on February 25, 2025).

157.   Epting's post that attached the cropped version of Kluwe's PSA post triggered many disparaging attacks on Kluwe on HB Insider and elsewhere.

158.   Multiple people accused Kluwe of literally threatening violence, said that the police should be contacted, and said Kluwe should be fired from his EHS coaching job. *See* Ex. 13 (full discussion thread).

159.   For example, on February 26 at 9:27 am, Chris Young commented on Epting's HB Insider post, saying "I would think HBPD would like to see that." He subsequently wrote that he did or would contact the HB police department and the EHS principal. *See* Ex. 17 (screenshot).

160.   On February 26 at 1:46 pm, a Huntington Beach police detective named Mona Klaibe contacted Kluwe. Klaibe said she called to inquire about his social media post that suggested violence.

161.   Kluwe said he did not mean to threaten anyone and tried repeatedly to explain the context of the post, which she was not interested in hearing. Kluwe ultimately said he would remove the post.

162.   Shortly after Kluwe's call with Klaibe he deleted his PSA post on Bluesky.

163.   Starting at 2:00 pm on February 26, Kluwe replaced the deleted PSA post with three others. *See* Exs. 18 (screenshots) & 19 (full discussion thread).

***Ex. 18****: Screenshots of Kluwe's clarifying Bluesky posts on February 26.*



164.    Referring to the PSA post, Kluwe said that the "Nazis" had "deliberately taken it wildly out of context," that he had meant to encourage people to "voice their displeasure" to City Council members' places of business, and that he never meant to suggest violence against the City Council. He emphasized that he always had endorsed *peaceful* civil disobedience. *See* Ex. 18.

165.    On February 26 at 4:45 pm PT, Epting published a post in the comments section of his earlier HIB Insider post. To this comment, Epting attached a screenshot of only the first of Kluwe's clarifying posts in which Kluwe said his PSA post had been taken "wildly of out context."

166.    Epting added a message to influence readers not to take Kluwe's clarification seriously. He said: "'Nazis'? Let me guess, 'context.'" *See* Ex. 20.

*Ex. 20:* Screenshot of Epting's HB Insider post on February 26 at 4:45 pm.



167.    The HB Insider group members continued making disparaging comments about Kluwe and his views.

168.    In particular, Young continued to stoke the fire that Epting had ignited with many original posts and comments across multiple Facebook groups. Young's posts tried to turn people against Kluwe and encourage people to think Kluwe should be fired from his coaching job at EHS.

169.    Young did so despite admitting in the February 26 thread started by Epting that he had "never been on [Bluesky]" himself. *See* Ex. 21.

170.    The admission confirms that Young never investigated the context of the PSA post before blowing up Facebook with disparagement of Kluwe.

171.    Social media posts also reflect criticisms of Kluwe by City Council members—including posts by Chad Williams (on February 19 on his Instagram account) and Butch Twining (on February 26 on HB Insider).

**On February 27, 2025, Begany and Boyce Informed Kluwe of His Discharge**

172.   The very next morning (February 27 at 8:25 am PT), EHS Athletic Director Rich Boyce called Kluwe to schedule a meeting at the EHS campus at noon along with Defendant Ed Begany.

173.   There, Begany told Kluwe that, due to the current attention the school was getting, they had no choice but to let him go.

174.   Begany offered Kluwe an option of resigning. Kluwe said he wanted to make clear that this is what MAGA does to a community. He said, it is not focused on what is best for the kids, but on what makes them feel better.

175.   Begany told Kluwe that he appreciated Kluwe remaining civil and that he supported Kluwe, but that it wasn't really his choice.

**February 27-28, 2024: Kluwe's Discharge Garners Significant Attention**

176.   On February 27, Kluwe announced through a Bluesky post that EHS had just fired him. *See* Exs. 22 (screenshot) & 23 (full discussion thread).

177.   Conveying his belief that his discharge was politically-motivated, Kluwe said it was an example of "what MAGA does to communities." He said they "don't care about what helps people" but only "about trying to hurt people." Ex. 22.

***Ex. 22****: Screenshot of Kluwe's Bluesky post on February 27.*



178.   That same day, Durham from Pride at the Pier recorded an interview with Kluwe describing the discharge meeting. The video was posted on Pride at the

Pier's Bluesky account, Facebook, and elsewhere.

179. The story of Kluwe's discharge received significant local and national media attention on February 27 and 28 including, for example, from the LA Times, OC Register, The Washington Post, Sports Illustrated, The Guardian, USA Today, ABC, NBC, CNN, and Fox News.

180. Multiple social media posts on Threads, X, and elsewhere provided contact information for EHS and encouraged people to object to Kluwe's firing for speaking out at the City Council meeting.

181. On Friday, February 28, 2025, U.S. Representative Dave Min—who represents California's 47th congressional district—sent a letter to Defendants Morris and Ogata. *See* Ex. 24.

182. The letter said copies were sent to California Attorney General Rob Bonta, Superintendent of Public Instruction Tony Thurmon, and the HBUHSD Board of Trustees, including Defendant Henry, Bonnie Castrey, Diana Carey, Duane Dishno, and Christine Hernandez. Min also published it on social media.

183. In the letter, Representative Min said he was "deeply concerned" that Kluwe had been discharged for the political speech he made earlier in the month "in which he criticized the Huntington Beach City Council for a proposed 'MAGA' plaque at the Huntington Beach Central Public Library." Pursuant to California's Public Records Act, Min's letter requested records relating to the decision to terminate Kluwe's employment.

**March 1-2, 2025: HB Residents Debate the Reason for Kluwe's Discharge; Epting Admits He Never Thought Kluwe Meant to Suggest Violence**

184. On Saturday, March 1, at 4:35 pm, Jeff Morrell (a local businessman in Huntington Beach) published a post on the HB CommUNITY Voice Facebook page about Kluwe that received 351 comments. *See* Ex. 25 (full thread).

185. Morrell's post included what appears to be a duplicate of Epting's cropped image of Kluwe's PSA post. *See* Ex. 26 (screenshot).

186.   Morrell said Kluwe's PSA post was "partly why Edison HS fired this guy."  He said the "emotional reaction to [Kluwe] is embarrassing," and that liberals need to find "another hero" who is not a "left wing zealot." Exs. 25 & 26. ***Ex. 26:*** *Screenshot of a post by Jeff Morrell on HB CommUNITY Voice on March 1.*



187.   Morrell appears to have received leaked information, given that the HBUHSD Defendants did not issue a press release (discussed below) until March 3 that notified Kluwe **for the very first time** that he was discharged for his PSA post.

188.   Buffie Channel (Facebook handle: Buffie Chanl) is a well-known progressive voice in Huntington Beach politics. She and others continually objected to the false narrative about Kluwe on the HB Facebook forums.

189.   For example, in response to Morrell's post on March 1, Channel emphasized the obvious context of Kluwe's statement and attached screenshots of his clarifying posts from February 26. *See* Ex. 27.

190.   Kathee Johnson's response to Channel exemplified the MAGA viewpoint, which was to stubbornly refuse to consider the context of Kluwe's post:

You are still trying to justify his actions. So why would he need to post this after his original post if his original post wasn't so wrong. He intended for people to take it the wrong way otherwise he wouldn't have posted that. Had

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS;
CASE NO. 8:25-CV-1648

1    it been from the otherside [sic], you most likely would not be defending him.

2    *See* Ex. 27.

3    191.   On Sunday, March 2 at 5:41 pm PT, Epting posted on the HB

4    CommUNITY Voice Facebook page. Commenting on Morrell's original post of

5    March 1 about Kluwe, Epting admitted that he **"never thought that [Kluwe]**

6    **literally was threatening to blow up buildings."** *See* Ex. 28.

7    ***Ex. 28:*** *Screenshot of Epting post in HB CommUNITY Voice on March 2, 2025.*



17    **March 3, 2025: HBUHSD and EHS Issue an Official Press Release to "Clarify"**

18    **the Reason for Kluwe's Discharge**

19    192.   The next day, on Monday, March 3, 2025, at 1:04 pm, HBUHSD and

20    EHS issued a press release that was distributed to media outlets and on Parent

21    Square (an electronic platform for school-parent communications) to all students,

22    parents, and staff at EHS—including Kluwe's own child who was a student at EHS.

23    193.   Kluwe took a screenshot of the Parent Square message, which appears

24    below. *See* Ex. 29.

25    194.   The press release purported to "clarify" why Kluwe was discharged,

26    saying it "was unrelated to his public comments" at the City Council meeting. It

27    said the decision was "based on a public social media post made by Mr. Kluwe,

28    which included a statement **suggesting violence** (see below)" (emphasis added).

*Ex. 29*: *Screenshot of a press release from HBUHSD and EHS on March 3, 2025.*



195.    The press release embedded a version of Kluwe's PSA post that had the "2d" tag in the right-hand corner. It appears to be the same image that Epting posted on February 26, 2025 on HB Insider, except that the version in the press release redacted the words "fuck."

196.    The press release further stated (emphasis added):

This post, which since has been deleted, was in direct violation of the district's standards for professionalism and appropriate conduct for staff

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS;
CASE NO. 8:25-CV-1648

members. While Mr. Kluwe removed the post, **he has not acknowledged that the post was the reason for his separation from the school.**

Due to personnel matters, HBUHSD is unable to elaborate further.

While HBUHSD values the right to free speech, the district does not condone or tolerate language that **promotes or suggests violence** in any form.

HBUHSD and Edison High School remain committed to maintaining a safe, respectful, and professional environmental for all students, staff, and community members.

197.   The HBUHSD Defendants have never contacted Kluwe to inform him that the PSA post was the reason for his discharge or to ask him for his side of the story—not before discharging him on February 27 nor before publishing the March 3 press release that contained an altered image of a social media post attributed to him and accusing him of promoting violence.

198.   On March 3 at 7:16 pm, Kluwe posted on Bluesky saying it appears that EHS is "doubling down and going for a defamation lawsuit" by "presenting a post as a violent threat without including the video that was attached to it that *explicitly* mentions review bombing as the subject[.]" *See* Ex. 30.

**March 3, 2025: While Young Celebrates the "Real" Reason for Kluwe's Discharge, Epting Repeats He Did Not Think Kluwe Threatened Violence**

199.   The HBUHSD's disparagement of Kluwe was amplified in an *OC Register* article that reported on its "clarification" of Kluwe's discharge. *See* Michael Slaten, *Huntington Beach Union High School District Says Chris Kluwe Was Fired for Social Media Post* (March 6, 2025, originally posted Mar. 3, 2025), https://www.ocregister.com/2025/03/03/huntington-beach-union-high-school-district-says-chris-kluwe-was-fired-for-social-media-post/.

200.   The article conveyed the details of the HBUHSD' press release. It further reported Kluwe's side of the story and his belief that the HBUHSD was trying to cover-up the real, unlawful reason for discharging him.

201.   On March 3, 2025, Chris Young published a post on HB CommUNITY Voice to announce that an *OC Register* article reported the "real" reason for Kluwe's discharge. He said: "And I don't want to hear 'I was taken out of context'... Sorry that's not gonna fly[.]" *See* Ex. 31.

202.   In Young's 35 comments to his own post, he pushed the narrative that Kluwe had promoted violence and was discharged for doing so. He attached the altered image of Kluwe's PSA post to support his ongoing false narrative.

203.   In a comment to Young's post at 7:40 pm PT (pasted below), Epting reiterated that **he "never thought [Kluwe] was literally talking about bombing buildings**." *See* Ex. 32 (screenshot).

**Kluwe's Interactions With Defendants Post-Termination**

204.   Even after Kluwe's discharge, he has continued to assist with moving band instruments during EHS students' competitions. No concerns have been expressed to Kluwe about potential violence.

205.   On May 22, 2025, Kluwe contacted Head Coach Grady by text. He asked whether, since "things have settled down a bit," there might still be a spot for him as a freshman coach in the Fall. He also asked whether Grady could provide contact information for the Fountain Valley football coaching staff for Kluwe to inquire about a position there. Grady did not respond.

206.   On May 28, 2025, Kluwe contacted Boyce to inquire whether he could use the EHS football field this summer for one-on-one training sessions with a student who will start at EHS as a freshman in the Fall, which Boyce had previously permitted. Boyce did not respond.

207.   On June 4, 2025, Kluwe submitted a Public Records Act request to the HBUHSD for a copy of the "standards for professionalism and appropriate conduct" that was referenced in the March 3 press release. The HBUHSD responded to that request on July 22, 2025 by citing a policy titled "BP 1315 – Civility Policy," which Kluwe has never seen.

208.   Board Policy 1315 is a Community Relations Civility Policy that reads as follows:

Members of the Huntington Beach Union High School District staff will treat parents and other members of the public with respect and expect the same in return. The district is committed to maintaining orderly educational and administrative processes, in keeping schools and administrative offices free from disruptions and preventing unauthorized persons from entering school or district grounds.

The Huntington Beach Union High School District seeks to promote mutual respect, civility, and orderly conduct among district employees, parents and the public. This policy is not intended to deprive any person of his/her right to freedom of expression but only to maintain, to the extent possible and reasonable, a safe, harassment-free workplace for our students and staff. In the interest of presenting district employees as positive role models to the children of this district, as well as in the community, the Huntington Beach Union High School District encourages positive communication and discourages volatile, hostile or aggressive actions. The district seeks public cooperation with this endeavor.

### FIRST CAUSE OF ACTION
**Retaliation In Violation of the First Amendment Under 42 U.S.C. § 1983: Retaliatory Discharge**
**(Against HBUHSD and All HBUHSD Individual Defendants in Their Individual and Official Capacities)**

209.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

210.   Under the First Amendment, "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142 (1983).

211.   The HBUHSD Defendants violated this clearly established standard when they fired Kluwe for exercising his First Amendment right to engage in off-

1    campus political speech about non-work subject matters.

2        212.   Kluwe engaged in highly-protected political speech on matters of
3    public concern on multiple occasions:

4        213.   (1) **On February 18, 2025**, Kluwe gave a speech to the City Council
5    to protest its proposed installation of a MAGA plaque at the library.

6        214.   (2) **On February 23, 2025**, in Kluwe's PSA post, he urged people to
7    stop calling the library to complain about the planned installation of the MAGA
8    plaque and to, instead, "blow up" the phone lines of the City Council members'
9    places of business with complaints.

10       215.   The plain language of Kluwe's message in the PSA post focused on
11   the library controversy, saying: "Stop fucking with the library. That's what the city
12   council is doing. The library is great, as are the people who work there."

13       216.   At all relevant times, the HBUHSD Defendants were aware that the
14   Huntington Beach library was a topic of hot political debate. The controversy was
15   the subject of significant media coverage, community discussion, and Kluwe's
16   protest on February 18, 2025 at the City Council meeting.

17       217.   Additionally, the term "blow up" is commonly used to mean to
18   "overwhelm (something, such as a phone) with calls, messages, alerts, etc.," as
19   reflected in the online Merriam-Webster Dictionary.

20       218.   Where the thrust of the speech relates to matters of public concern,
21   inclusion of offensive or controversial speech (*e.g., Rankin v. McPherson*, 483 U.S.
22   378 (1987)) or an employer's contention that the speech violates an organizational
23   policy (*e.g., Hernandez v. City of Phoenix*, 43 F.4th 966 (9th Cir. 2022); *Moser v.
24   Las Vegas Metropolitan Police Dept.,* 984 F.3d 900 (9th Cir. 2021)) do not rob it of
25   its First Amendment protection.

26       219.   With or without the Pride at the Pier's message and video that had
27   been cropped out of Kluwe's original PSA post, the political nature of that post was
28   obvious in light of the plain language of the message and its form and context. *See*

*Connick,* 461 U.S. at 148 (whether speech relates to matters of public concern is determined in light of its content, form, and context based on the whole record).

220.   Because of the "substantial likelihood" that Kluwe's PSA post implicated First Amendment protections, the HBUHSD Defendants were required to "tread with a certain amount of care" by conducting a reasonable inquiry into its protected nature before relying on it as a basis for discharge. *Waters v. Churchill,* 511 U.S. 661, 677-78 (1994) (plurality).

221.   Any such inquiry by the HBUHSD Defendants would have confirmed that Kluwe's PSA post was highly-protected political speech.

222.   (3) **After February 27, 2025**, Kluwe publicly complained on multiple occasions that, in violation of his First Amendment rights, the HBUHSD Defendants discharged him because of his speech to the City Council that criticized MAGA. His complaints were amplified by others in the community, including Congressman Min.

223.   Kluwe's speech occurred in his role as a private citizen rather than a public employee. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

224.   On all occasions of Kluwe's protected speech, he was speaking as a private citizen of Huntington Beach and was ***not*** on the job at EHS. Indeed, football season was still five to six months away.

225.   The HBUHSD Defendants took "adverse employment actions" against Kluwe, which includes anything reasonably likely to deter engagement in protected activity under the First Amendment. *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003).

226.   The HBUHSD Defendants engaged in at least three adverse employment actions against Kluwe: (1) conducting a sham investigation into his PSA post, (2) discharging him on February 27, and (3) publishing defamatory statements that Kluwe had promoted violence.

227.   Kluwe's protected speech was a motivating factor for the HBUHSD

Defendants' adverse employment actions. *Eng,* 552 F.3d at 1070.

228.   As to Kluwe's discharge, the HBUHSD Defendants publicly stated in the press release of March 3, 2025 that they discharged Kluwe because of his PSA post on Bluesky—a post that was plainly protected political speech.

229.   As to the non-existent or sham investigation into Kluwe's PSA post and the defamatory statements that Kluwe promoted violence, the HBUHSD Defendants were motivated by the additional reasons that Kluwe had complained that his discharge was unlawful and that he had engaged in protected political speech about the MAGA plaque to the City Council. The close temporal proximity of all the events—i.e., the short time-span between the protected activities and the adverse employment actions—sufficiently pleads the motivation prong.

230.   Additional allegations further support that the HBUHSD Defendants acted with an unlawful retaliatory motive when they discharged and defamed Kluwe based on a sham investigation:

231.   The HBUHSD Defendants knowingly or recklessly failed to consider alternative definitions of the term "blow up," including dictionary definitions and Kluwe's own clarifying social media posts.

232.   On February 26, 2025, after Kluwe deleted the PSA post from Bluesky, he replaced it with multiple posts clarifying that his post had been taken "wildly out of context" by politically-motivated antagonists and explained what "blow up" meant. He said that he never intended to suggest violence, and he had repeatedly emphasized *peaceful* civil disobedience. *See* Ex. 18.

233.   The HBUHSD Defendants either were not aware of Kluwe's clarifying posts due to their reckless failure to investigate or were fully aware of those posts and recklessly or intentionally disregarded them to support their "clarification" that Kluwe was discharged for promoting violence.

234.   The HBUHSD Defendants intentionally or recklessly failed to provide Kluwe with notice that he violated the Civility Policy and an opportunity to tell his

side of the story.

235.   Upon information and belief, the HBUHSD Defendants' discharge decision relied on information from sources they knew were politically partisan and hostile to Kluwe's speech or recklessly disregarded the likelihood of that fact.

236.   Unlawful motive is further supported by the HBUHSD Defendants' disregard for their own School District policies and guidelines in connection with discharging and defaming Kluwe based on a sham investigation.

237.   The HBUHSD Defendants' own established policies do not permit the regulation of employees' political speech outside working hours and off-campus (e.g., Civil & Legal Rights, BP 4119.1; Political Activities of Employees, BP 4119.26 & AR 4119.26; Participation in Community Life, BP 1311).

238.   Likewise, the California Education Code §§ 7052 and 7055 permits regulation of employees' political speech only on-campus and during working hours (*see also* Cal. Labor Code §§ 98.6(a), 96(k), 1101, 1102) based on the recognition of school employees' First Amendment rights.

239.   The HBUHSD Defendants also disregarded their own designation of personnel records as "confidential"—the disclosure of which subjects School District personnel to discipline (AR 1340, BP4119.23)—when they publicly disclosed an unfounded defamatory rationale for Kluwe's discharge.

240.   The HBUHSD Defendants' sham investigation and disregard of their own policies to justify discharging Kluwe and publicizing a false, defamatory rationale for that decision reinforces that their stated reason (he promoted violence against the City Council in violation of the Civility Policy) is pretextual and that they knew that their real motives (Kluwe's library-related advocacy and protected complaints about his discharge) were unlawful.

241.   Upon information and belief, the HBUHSD Defendants have never disciplined any staff member under the Civility Policy for a similar infraction without an investigation, warning, or progressive discipline or publicly announced

1   the reason for a discharge.

2       242.   Kluwe further alleges that, even after his discharge, he has continued

3   to assist at school band competitions in which his child participates.

4       243.   The significant unlikelihood that HBUHSD Defendants would permit

5   a person suspected of violent tendencies to interact with students confirms the

6   obvious: The HBUHSD Defendants never believed that Kluwe actually promoted

7   violence in his social media post.

8       244.   If the HBUHSD Defendants assert a defense under *Pickering v. Bd. of*

9   *Ed. of Twp. High Sch. Dist.,* 391 U.S. 563 (1968)—i.e., that a substantial disruption

10  to school operations outweighed the value of Kluwe's free speech rights—they

11  carry the burden to prove it. Upon information and belief, the HBUHSD

12  Defendants did not rely on any disruption of school operations stemming from the

13  PSA post as a basis for discharging Kluwe and no such disruption occurred.

14      245.   In violation of Kluwe's First Amendment rights, the HBUHSD

15  Defendants punished and retaliated against him because of his constitutionally

16  protected speech and for viewpoints they disliked by discharging him based on a

17  sham investigation and publishing defamatory statements about him.

18      246.   The HBUHSD Defendants continue to violate Kluwe's rights by

19  barring him from working as a high school football coach in the HBUHSD without

20  justification, continuing to publish the unfounded defamatory rationale for his

21  discharge, and maintaining files that contain the defamatory statements.

22      247.   In depriving Kluwe of these rights, HBUHSD Defendants acted under

23  color of state law and violated 42 U.S.C. § 1983.

24      248.   Kluwe has no adequate legal remedy by which to prevent or minimize

25  the continuing irreparable harm to his First Amendment rights.

26      249.   As a result of the HBUHSD Defendants' violation of Kluwe's First

27  Amendment rights, which are irreparable injuries *per se*, he is entitled to injunctive

28  and declaratory relief against the HBUHSD and the Individual HBUHSD

Defendants in their official capacities as set forth in the Prayer for Relief.

250.   Kluwe is further entitled to compensatory damages against the HBUHSD and HBUHSD Individual Defendants in their individual capacities because their actions have caused Kluwe to experience injury to his reputation, significant emotional distress, and lost compensation.

251.   Kluwe also is entitled to punitive damages against the HBUHSD Individual Defendants in their individual capacities because they intentionally or recklessly misinterpreted the PSA post as literally promoting violence rather than as protected political speech; relied on a sham or non-existent investigation that ignored Kluwe's clarifying social media posts, failed to ask him his side of the story, and considered politically-motivated sources of information; and disregarded their own policies in order to justify discharging Kluwe and publicly defame him. *See Dang v. Cross,* 422 F.3d 800, 806-807 (9th Cir. 2005).

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's First & Fourteenth Amendment Rights**
**Under 42 U.S.C. § 1983: "As Applied" Challenge to the Civility Policy**
**(Against the HBUHSD and All HBUHSD Individual Defendants In Their**
**Official and Individual Capacities)**

252.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

253.   According to the HBUHSD Defendants' press release of March 3, 2025, Kluwe was discharged for promoting violence in violation of "the district's standards for professionalism and appropriate conduct," which bans "unprofessional" and "inappropriate" speech, purportedly to serve the HBUHSD's interests in "maintaining a safe, respectful, and professional environment for all students, staff, and community members." *See* Ex. 29.  According to the HBUHSD's response to Kluwe's Public Records Act request, the professionalism standards referenced in the press release are contained in the Community Relations

Civility Policy (BP 1315).[3]

254.   As applied to Kluwe's speech, the Civility Policy is unconstitutional under the First and Fourteenth Amendments, even if it "may be capable of valid application to others." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998).

255.   The Civility Policy's application to Kluwe is unconstitutional on three grounds: (1) overbreadth, (2) vagueness, and (3) viewpoint discrimination.

256.   First, as applied to Kluwe, the Civility Policy is unconstitutionally overbroad.

257.   Kluwe published the PSA post, for which he was fired under the Civility Policy, during nonworking hours and off-campus.

258.   At the time Kluwe was discharged, he was an assistant coach on the freshman football team and had no policy-making authority at EHS or HBUHSD.

259.   Kluwe had no job functions within the school administration and rarely interacted with administrative personnel or parents.

260.   Kluwe interacted primarily with football players and other football coaches during the football season, which typically lasted from July-November.

261.   Kluwe had no teaching duties at EHS and was not part of the classified service or certificated staff.

262.   The message that Kluwe wrote in the PSA message (i.e., "Stop fucking with the library. That's what the city council is doing.") reflected that the topic of the post was not work-related.

263.   The PSA post did not target any EHS student or employee but was directed at people review bombing the library and the City Council.

---

[3] The Civility Policy (BP 1315) is categorized as a Community Relations policy (not a Personnel policy) that appears to be an aspirational statement to the community. Its stated intent is to provide a "safe, harassment-free workplace for [HBUHSD's] students and staff" by encouraging respectful behavior in interactions with them. Thus, in addition to being unconstitutionally applied to Kluwe, the Civility Policy does not even purport to be a personnel policy that can be relied upon to discipline Kluwe for off-duty speech directed at City Council members.

264.    Although the language of the Civility Policy appears to reach third parties like City Council members by "promot[ing] mutual respect, civility and orderly conduct among district employees" and "the public," such a regulation extends well beyond speech in which the HBUHSD Defendants have any legitimate administrative interests in regulating to avoid workplace disruption.

265.    The message that Kluwe wrote in the PSA message was understood by the HBUHSD Defendants to be about the community controversies that had arisen because of the City Council's decision to install a MAGA plaque at the library and/or the City Council's general interference with the library's functioning.

266.    The HBUHSD Defendants did not give Kluwe notice of their belief that his PSA post violated the Civility Policy and an opportunity to tell his side of the story.

267.    The HBUHSD Defendants appear to interpret the Civility Policy as prohibiting Kluwe from engaging in uncivil or disrespectful speech on matters of public concern made in his capacity as a private citizen, outside the scope of official duties. They apparently chose to ignore the Civility Policy's carve-out for individuals' "right[s] to freedom of expression," which should exempt political speech or other forms of speech on matters of public concern and speech that does not substantially disrupt workplace functioning.

268.    The HBUHSD Defendants appear to interpret the Civility Policy to authorize discharging Kluwe even for speech for which "there is a substantial likelihood" of First Amendment protection without any reasonable inquiry to determine the protected nature of the speech. *Waters,* 511 U.S.at 677. This overbreadth creates a major risk of "inadvertently punishing someone for exercising [his] First Amendment rights." *Id.* at 678.

269.    Under the circumstances alleged, the weight of Kluwe's high-value political speech far outweighed any legitimate interest by the HBUHSD Defendants in preventing workplace disruption through application of the Civility Policy to

CROWELL
& MORING LLP
ATTORNEYS AT LAW

him. *Hernandez,* 43 F.4th at 977. Therefore, its application to Kluwe was unconstitutionally overbroad.

270.    Second, as applied to Kluwe, the Civility Policy also is unconstitutionally vague for multiple reasons.

271.    The Due Process clause of the Fourteenth Amendment creates a "fundamental principle in our legal system" that government regulations over people's behavior "must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations Inc.,* 567 U.S. 239, 253 (2012).

272.    When First Amendment interests are at stake, courts apply the Due Process vagueness analysis with heightened scrutiny to ensure that freedom of speech has sufficient breathing space to survive. *Bullfrog Films Inc. v. Wick,* 847 F.2d 502, 513 (9th Cir. 1988); *California Tchrs. Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1150 (9th Cir. 2001).

273.    Kluwe does not recall ever receiving a copy of the Civility Policy and was unaware of its contents until after the HBUHSD's response to his Public Records Act request on July 22, 2025. He had no notice of its provisions.

274.    Even if Kluwe had received notice of the Civility Policy, a purported ban on any disrespectful or uncivil speech (apparently whether expressed on- or off-duty) that may detract from a "safe, harassment-free workplace" offered Kluwe no discernible standard from which to determine what types of speech would subject him to discipline and no explicit standards to prevent arbitrary and capricious application. *FCC,* 567 U.S. at 253; *Cohen v. San Bernardino Valley Coll.,* 92 F.3d 968 (9th Cir. 1996); *Hernandez,* 43 F.4th at 979.

275.    He had no notice that off-duty, off-campus, political speech about nonwork topics would subject him to discharge without notice, any hearing, or progressive discipline.

276.    Third, as applied here, the Civility Policy was interpreted in a way to unlawfully discriminate based on Kluwe's political viewpoint.

277.   As interpreted by the HBUHSD Defendants, the Civility Policy bans any uncivil or disrespectful speech about members of the public. This interpretation of the Policy "single[s] out a subset of messages for disfavor based on the views expressed" (*Matal v. Tam,* 582 U.S. 218, 248 (2017) (Kennedy, J., concurring)) because any decision regarding whether speech violates those provisions requires a viewpoint determination (*see Flores,* 635 F. Supp. 3d at 1035–37; *Mama Bears of Forsyth Cnty. V. McCall,* 642 F. Supp. 3d 1338 (N.D. Ga. 2022)).

278.   For example, broadly banning employee speech that does not "promote mutual respect, civility, and orderly conduct" with no explicit guardrails permits personally-biased determinations that politically-favored speech is appropriate (e.g., Trump-supportive speech) while politically-disfavored speech is inappropriate (e.g., speech criticizing MAGA).

279.   The HBUHSD Defendants applied the Civility Policy in a way that violated Kluwe's First Amendment rights by singling out his messages for disfavor because of the politically liberal views expressed in those messages.

280.   The HBUHSD Defendants applied the Civility Policy in a manner that singled out Kluwe's messages for disfavor by: (1) conducting a sham investigation into Kluwe's PSA social media post, (2) discharging Kluwe, and (3) publishing defamatory statements that Kluwe promoted violence.

281.   The HBUHSD Defendants' application of the Civility Policy to Kluwe in this manner was unlawfully motivated by their disagreement with Kluwe's political viewpoints expressed in his public statements between February 18 and March 2, 2025 and in detail in his speech to the Huntington Beach City Council on February 18, 2025 objecting to the MAGA plaque.

282.   In Kluwe's speech on February 18, 2025, he expressed his political viewpoint that MAGA is corrupt and anti-democracy; that it stands for trying to erase trans people from existence, resegregation and racism, and censorship and book bans; and that it is a Nazi movement.

283.   The HBUHSD Defendants would not have taken the same actions against an HBUHSD employee who criticized Democrats or other liberal-leaning groups or who had spoken in favor of Trump or MAGA and all it stands for.

284.   Upon information and belief, the HBUHSD Defendants have never disciplined any staff members for politically conservative speech that allegedly violated the Civility Policy without an investigation, warning, or progressive discipline.

285.   By applying the Civility Policy to Kluwe in a manner that deprived him of his constitutional rights, the HBUHSD Defendants acted under color of state law and violated 42 U.S.C. § 1983.

286.   The HBUHSD Defendants continue to violate Kluwe's rights by barring him from working as a football coach based on their unlawful application of the Civility Policy to him, continuing to publish the unfounded defamatory rationale for his discharge, and maintaining files with defamatory statements.

287.   As a result of the HBUHSD Defendants' unlawful application of the Civility Policy to Kluwe, he has suffered irreparable injury, including being deprived of his constitutional rights to free expression and due process.

288.   Kluwe has no adequate legal remedy by which to prevent or minimize the continuing harm to his First and Fourteenth Amendment rights.

289.   As a result, Kluwe is entitled to declaratory and injunctive relief against the HBUHSD and the HBUHSD Individual Defendants in their official capacities, as set forth below in the Prayer for Relief.

290.   Kluwe is entitled to compensatory damages against the HBUHSD and the HBUHSD Individual Defendants in their individual capacities for causing injury to his reputation, significant emotional distress, and lost compensation.

291.   Kluwe is further entitled to punitive damages against the HBUHSD Individual Defendants in their individual capacities because they intentionally or recklessly misconstrued the Civility Policy to authorize Kluwe's discharge;

misinterpreted the PSA post as literally promoting violence rather than as protected

political speech; relied on a sham or non-existent investigation that ignored

Kluwe's clarifying social media posts, failed to ask him his side of the story, and

considered politically-motivated sources of information; and disregarded many

their own policies in order to justify discharging Kluwe and publicly defame him.

**THIRD CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Rights**
**Under 42 U.S.C. § 1983:**
**Deprivation of <u>Property and Liberty</u> Without Due Process**
**(Against the HBUHSD and All HBUHSD Individual Defendants in Their**
**Official and Individual Capacities)**

292.    Plaintiff re-alleges and incorporates by reference each and every

allegation set forth in the preceding paragraphs of this Complaint.

293.    The HBUHSD Defendants deprived Kluwe of both liberty and

property interests protected by the Constitution without adequate process in

violation of the Fourteenth Amendment. *Jensen v. Brown*, 131 F.4th 677, 699 (9th

Cir. 2025).

294.    The HBUHSD Defendants deprived Kluwe of a **liberty** interest by

publishing stigmatizing statements about him in connection with his discharge, the

accuracy of which Kluwe disputes, and which harmed his "good name, reputation,

honor, or integrity." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573

(1972); *Chaudhry v. Aragon,* 68 F.4th 1161 (9th Cir. 2023).

295.    In the press release of March 3, 2025, the HBUHSD Defendants

publicly stated that Kluwe was discharged for promoting violence.

296.    The press release also said that Kluwe "has not acknowledged that the

[PSA social media] post was the reason for his separation from the school." This

statement implied that the HBUHSD Defendants had previously informed Kluwe

that he was discharged for the PSA social media post. But they had not done so.

297.    The statement implied that Kluwe was lying when he complained that

he was discharged for his protected political speech to the City Council.

298.   The gist of the HBUHSD Defendants' defamatory statements is that Kluwe is a liar who promoted killing or maiming City Council members by literally blowing up their places of business with explosives.

299.   Kluwe strongly contests the accuracy of the defamatory statements.

300.   The HBUHSD Defendants' defamatory statements imposed a stigma of moral turpitude that has seriously damaged Kluwe's reputation as a desirable, safe football coach fit to work as a high school freshman coach and his community standing as a peaceful, credible community activist.

301.   The HBUHSD Defendants deprived Kluwe of a protected **property interest** by discharging him "during the term of [his] contract[.]" *Roth,* 408 U.S. at 576-77.

302.   Kluwe had a protected property interest in his coaching job for the 2025 football season because, during conversations in February 2025, Head Coach Jeff Grady and Freshman Head Coach Shaun Colamonico had confirmed with Kluwe that he would return as a coach for that season.

303.   Kluwe also has a **property interest** in his coaching job based on HBUHSD Board Policy 4119.1, which states that "No employee will be disciplined…without just cause." *See Williams v. Cnty. of L.A.,* 22 Cal. 3d 731, 736 (1978) (county rule permitting release of seasonal employees only for unsatisfactory performance created a property interest in the job that triggered due process rights); *Mendoza v. Regents of Univ. of Cal.*, 78 Cal. App. 3d 168, 175 (Ct. App. 1978) (university rules implying that dismissal could be based only on misconduct or unsatisfactory service created a property interest).

304.   Despite Kluwe having protected liberty and property interests in his position as an EHS football coach, the HBUHSD Defendants discharged and defamed him without providing him a ***pre-***termination hearing (*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972); *Matthews v. Harney County,* 819 F.2d 889, 891 (9th Cir. 1987)), an oral or written notice of the charges, an

explanation of their evidence, and an opportunity to present his side of the story. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985); *see also Skelly v. State Pers. Bd.,* 15 Cal. 3d 194, 215 (1975).

305.   Kluwe received no notice of the reason for his discharge before Defendant Begany informed him of his discharge on February 27, 2025. During that sole meeting that Kluwe had with anyone at EHS about his discharge, the decision already had been made.

306.   In that meeting, Defendant Begany said only that Kluwe was being discharged because the school was getting too much attention. Begany did not mention Kluwe's PSA post at all.

307.   Had the HBUHSD Defendants provided Kluwe with Due Process, any ambiguity about his PSA social media post would have been clarified, and they would not have discharged him on that basis and defamed him.

308.   The HBUHSD Defendants' termination of Kluwe and publication of defamatory statements without a hearing deprived him of his constitutionally-protected liberty and property interests in his coaching position at EHS without Due Process in violation of his Fourteenth Amendment Due Process rights.

309.   The HBUHSD Defendants continue to violate Kluwe's rights by barring him from working as a high school football coach in the HBUHSD without justification, continuing to publish the unfounded defamatory rationale for his discharge, and maintaining files that contain the defamatory statements.

310.   In depriving Kluwe of these rights, the HBUHSD Defendants acted under color of state law and violated 42 U.S.C. § 1983.

311.   Kluwe has no adequate legal remedy by which to prevent or minimize the continuing irreparable harm to his constitutional rights.

312.   As a result of the HBUHSD Defendants' violation of Kluwe's Due Process rights, which are irreparable injuries *per se*, he is entitled to injunctive and declaratory relief against HBUHSD and the Individual HBUHSD Defendants in

1   their official capacities as set forth in the Prayer for Relief.

2       313.   Kluwe is further entitled to compensatory damages against HBUHSD

3   and the HBUHSD Individual Defendants in their individual capacities for injuries

4   they caused to his reputation, significant emotional distress, and lost compensation.

5   *See Carey v. Piphus*, 435 U.S. 247 (1978) (nominal, compensatory, and punitive

6   damages are available for Due Process violations).

7       314.   Kluwe is further entitled to punitive damages against the HBUHSD

8   Individual Defendants in their individual capacities due to their reckless

9   indifference to his constitutional rights.

10                  **FOURTH CAUSE OF ACTION**

11                     **False Light Defamation**
               **(Against Defendant Christian Epting)**

12       315.   Plaintiff re-alleges and incorporates by reference each and every

13   allegation set forth in the preceding paragraphs of this Complaint.

14       316.   The first element of a false-light defamation cause of action is satisfied

15   here because Epting *published* a statement. Cal. Civ. Code §§ 45, 45a.

16       317.   Epting published the cropped version of Kluwe's PSA post on at least

17   two occasions on February 26, 2025 in the HB Insider Facebook group.

18       318.   The image Epting posted contained Kluwe's name and was understood

19   by others to refer to Plaintiff Chris Kluwe.

20       319.   In Epting's publication of February 26 at 9:24 am PT, he added the

21   comment: "I hope the library renounces this kind of language and behavior."

22       320.   The comment encouraged people to interpret the cropped version of

23   Kluwe's post as representing a real threat that needed to be taken seriously and

24   addressed.

25       321.   Epting's altered image of Kluwe's PSA post was republished by

26   multiple others including, but not limited to, by Betty Flynn (February 26, 2025 on

27   HB Insider), Chris Young (February 27, 2025 on HB CommUNITY Voice), Kathy

28   Carrick (February 27, 2025 on HB CommUNITY Voice), Jeff Morrell (March 1,

2025 on HB CommUNITY Voice), the HBUHSD Defendants (March 3 to media outlets and on Parent Square to all students, parents, and staff at EHS), and Chris Young (March 3, 2025 on CommUNITY Voice). The social media posts have hundreds of comments and reactions.

322.  Given Epting's experience with the Facebook forums for Huntington Beach residents and knowledge of their cultures, he could have reasonably foreseen the republication of his cropped version of Kluwe's PSA post. *See Schneider v. United Airlines, Inc.,* 208 Cal. App. 3d 71, 74 (1989).

323.  Kluwe further alleges that, based on the totality of the circumstances, including both language and context, the "gist or sting" of Epting's publication of Kluwe's PSA post was *false. Balla v. Hall,* 59 Cal. App. 5th 652, 678 (2021).

324.  Although Epting's screenshot of Kluwe's PSA post constituted a literally accurate duplication of Kluwe's words, Epting's alteration of Kluwe's original post took it out of context in a manner that rendered it false.

325.  Epting's alteration changed the PSA post from one that was unmistakably about non-violent "review bombing" and "blowing up" phone lines to one that was more susceptible to an interpretation that Kluwe had literally promoted violence against the City Council.

326.  By transferring Kluwe's PSA post from an audience friendly to Kluwe (Bluesky) to an audience Epting knew would be hostile to Kluwe's liberal politics (HB Insider), Epting exponentially increased the likelihood that any susceptibility to misinterpretation of the post would be exploited to harm Kluwe.

327.  Epting's "material change" to Kluwe's meaning in his original PSA post "amount[s] to a knowing falsehood." *Balla,* 59 Cal. App. 5th at 688 ("statements that were taken out of context or otherwise misleading" can be deemed false statements of fact); *see also id.* ("an exact quotation out of context can distort meaning, although the speaker did use each reported word"); *Huntington Beach City Council v. Sup. Ct.,* 94 Cal. App. 4th 1417, 1432 (2002) ("context may show

1  that a statement that, in one sense, can be said to be literally true can still be

2  materially misleading").

3      328.   Further, Epting's publications were defamatory, meaning they exposed

4  Kluwe "to hatred, contempt, ridicule, or obloquy," which caused "him to be

5  shunned or avoided," or had "a tendency to injure him in his occupation." Cal. Civ.

6  Code, § 45.

7      329.   Epting's publications were defamatory on their face—or *per se*

8  defamatory—because a reader "could understand the defamatory meaning without

9  the necessity of knowing extrinsic explanatory matter." *Balla,* 59 Cal. App. 5th at

10  685.

11      330.   Even though the implied defamatory insinuation in Epting's altered

12  version of Kluwe's post left room for an innocent interpretation (*Selleck v. Globe

13  Int'l, Inc.,* 166 Cal. App. 3d 1123, 1130-311 (1985)), it "reasonably convey[ed] a

14  defamatory meaning … to those to whom it was published" *(id.; accord Burnett v.

15  Nat'l Enquirer, Inc.,* 144 Cal. App. 3d 991, 1013-14 (1983)).

16      331.   As of the date of this Complaint, Epting's HB Insider post of February

17  26, 2025 at 9:24 am that attached the cropped version of the PSA post had 122

18  comments and 87 reactions.

19      332.   Comments on that post reflecting people's belief that Kluwe was

20  promoting violence, should be reported to the police, and was unfit to be a high

21  school coach or City Council member show that the post was libelous on its face.

22      333.   Republications of Epting's cropped version of the PSA post by other

23  people also reflect that a defamatory meaning was conveyed.

24      334.   In case Kluwe is deemed a public figure, he also alleges that Epting

25  made the defamatory publications with "actual malice"—i.e., "with knowledge of

26  their false implications or with reckless disregard of their truth." *Hyphy Music, Inc.

27  v. Sena*, 2025 WL 842893, at *8 (E.D. Cal. Mar. 18, 2025); *see Balla,* 59 Cal. App.

28  at 683-85; *Solano v. Playgirl, Inc.,* 292 F.3d 1078 (9th Cir. 2002).

335.   In two social media posts in the HB CommUNITY Voice Facebook group, Epting said he "never thought that [Kluwe] literally was threatening to blow up building" (March 2, 2025) and "never thought [Kluwe] was literally talking about bombing buildings" (March 3, 2025).

336.   Despite never believing that Kluwe literally was promoting violence, Epting knowingly or recklessly created the false impression that Kluwe was, in fact, literally promoting violence when Epting posted an altered version of Kluwe's PSA post in the HB Insider Facebook group hostile to Kluwe.

337.   Epting has significant experience interacting in the HB Insider Facebook group. He knows that the politically conservative group would be hostile to Kluwe's liberal political ideology.

338.   On previous occasions, Epting has been involved in influencing groups of people on Facebook or other social media platforms to attack other people's credibility, jobs, or professional standing because of his personal or political disagreements with them.

339.   Epting disapproved of the content of Kluwe's speech to the City Council on February 18, 2025.

340.   Epting disapproved of calls from Huntington Beach community members for Kluwe to run for City Council.

341.   Based on Epting's interactions on HB Insider, he knew that many people in that forum disapproved of the content of Kluwe's speech to the City Council on February 18, 2025.

342.   Epting knows his status as a local celebrity amplifies his influence on some participants in the Facebook forums for Huntington Beach residents.

343.   Epting's Facebook posts about Kluwe's PSA post instigated a politically-partisan, hostile mob that he knew would likely report Kluwe to the police, try to get him fired from his EHS position, or harm him in other ways.

344.   Epting acted with actual malice when he presented the cropped image

CROWELL
& MORING LLP
ATTORNEYS AT LAW

of Kluwe's PSA post as if it were factual—i.e., a true and accurate replication of a post made by Kluwe—knowing it was not, and knowing or recklessly disregarding that the post would be interpreted by others in the HB Insider group as a true and accurate replication of a post by Kluwe that literally promoted violence.

345.   As a direct and proximate cause of the Epting's actions, Kluwe was discharged from his job as a football coach at EHS and has had at least one private one-on-one kicking lesson cancelled, causing special damages in the form of lost compensation.

346.   Kluwe continues to be cloaked in the stigma created by Epting's conduct that is likely to interfere with Kluwe's ability to be hired for another high school coaching job within HBUHSD schools and elsewhere.

347.   Kluwe is entitled to general compensatory damages caused by the injury to his reputation and significant pain and suffering arising from his own shame, mortification, and hurt feelings as well as that of his family members.

348.   Punitive damages also are available because the facts alleged above reflect that Epting consciously disregarded Kluwe's rights when he recklessly posted an altered version of Kluwe's PSA post in a hostile Facebook forum with comments encouraging readers to take the post seriously and to discount Kluwe's posts clarifying that he did not mean to encourage literal violence. *See Burnett,* 144 Cal. App. 3d at 1009 n.9.

349.   The facts alleged above also reflect Epting's intent to vex, injure, and annoy Kluwe because Epting strongly disagreed with Kluwe's political messages and was disgusted that any Huntington Beach residents would seriously consider him as a candidate for City Council.

350.   Further, Epting monitored Kluwe's social media posts, hunted for information online that he could use to discredit and harm Kluwe, and repeatedly mocked and mischaracterized things that Kluwe had said.

351.   As a consequence of Epting's false light-defamatory statements,

1 Kluwe also is entitled to declaratory and injunctive relief.

2  352. Kluwe has no adequate legal remedy by which to prevent or minimize

3 the continuing irreparable harm to his reputation caused by Epting's false light-

4 defamatory statements.

5  353. Without declaratory and injunctive relief from this Court, Epting's

6 unlawful actions will continue, and Kluwe will continue to suffer irreparable harm

7 to his reputation and ability to continue to coach high school football.

8  354. Therefore, Kluwe is entitled to injunctive and declaratory relief against

9 Defendant Epting as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

11 WHEREFORE, Chris Kluwe respectfully requests that this Court enter

12 judgment against Defendants and issue the following forms of relief:

### **FIRST-THIRD CAUSES OF ACTION**
### **(Against HBUHSD Defendants)**

15 1. Injunctive and declaratory relief against the HBUHSD and Individual

16 HBUHSD Defendants in their official capacities as follows.

  a. A declaration that the HBUHSD Defendants are retaliating against
    Kluwe for protected speech in violation of his First Amendment
    rights;

  b. A declaration that, as applied to Kluwe, the HBUHSD's Civility
    Policy is unconstitutionally overbroad, vague, and/or discriminates
    based on viewpoint, in whole or in part.

  c. An order enjoining the application of HBUHSD's unconstitutional
    Civility Policy to Kluwe, in whole or in part;

  d. A declaration that the HBUHSD Defendants violated Kluwe's right
    to Due Process by discharging and defaming him without notice
    and an opportunity to be heard;

  e. A declaration that Kluwe is eligible for reinstatement/rehire at EHS

1    and any other HBUHSD school during the next available football

2    season;

3        f.    An order to expunge all personnel-related electronic and hard copy

4            files or data systems within HBUHSD's control (including

5            messages on Parent Square) to remove any information that Kluwe

6            was involuntarily discharged, the reason for his discharge, and

7            indicating that he cannot be rehired;

8        g.    An order requiring a public retraction of the defamatory statement

9            made in the HBUHSD Defendants' press release of March 3, 2025

10            and any other public statements of the reasons for Kluwe's

11            discharge;

12        h.    An order that Kluwe's exercise of First Amendment-protected free

13            speech shall not be used to deny him a position at any HBUHSD

14            school during any future football seasons;

15        i.    An order enjoining the HBUHSD Defendants and their agents,

16            employees, and all other persons or entities in active concert or

17            privity or participation with them, from retaliating against Kluwe

18            for bringing this lawsuit or for advocating for his free speech and

19            due process rights.

20    2.    Nominal damages for the violation of Kluwe's constitutional rights.

21    3.    Compensatory damages against the HBUHSD and HBUHSD

22 Individual Defendants in their individual capacities in an amount to be determined

23 at trial to compensate Kluwe for the interference with his rights and for injury to his

24 reputation, significant emotional distress, and lost compensation.

25    4.    Reasonable costs of this lawsuit, including reasonable attorneys' fees,

26 against the HBUHSD Defendants under 42 U.S.C. §1988 and other applicable law.

27    5.    Punitive damages against the HBUHSD Individual Defendants in their

28 individual capacities in an amount to be determined at trial.

6. Pre-judgment interest in an amount to be determined after trial (*Golden State Transit Corp. v. City of Los Angeles*, 773 F. Supp. 204 (C.D. Cal. 1991)) as well as post-judgment interest pursuant to 28 U.S.C. § 1961.

7. All further legal and equitable relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
### (Against Defendant Epting)

8. Injunctive and declaratory relief against Defendant Epting as follows:

   a. A declaration that Epting tampered with a social media image originally published by Kluwe in order to place Kluwe in a false light, defame him, and harm him;

   b. An order that Epting must cease publishing the altered image that placed Kluwe in a false light and implied the highly offensive allegation that he is violent;

   c. An order to publicly retract and apologize for such defamatory statements on all online platforms on which the altered social media image was posted.

9. An award of special and general compensatory damages in an amount to be determined at trial for Kluwe's financial loss caused by his loss of paid employment and for injury to his reputation as well as his personal and familial pain and suffering.

10. An award of punitive damages in an amount to be determined at trial to punish Defendant Epting for defaming Kluwe with intent to vex, injure, or annoy, or with a conscious disregard of his rights.

11. Costs pursuant to Fed. R. Civ. P. 54(d) and other applicable law.

12. All further legal and equitable relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 28, 2025                                CROWELL & MORING LLP


By: */s/ Daniel A. Sasse*
Daniel A. Sasse
David C. Griffith
Moriah E. Denton

Attorneys for Plaintiff Chris Kluwe

Dated:  July 28, 2025                                LAW PRACTICE OF ANNE BRAFFORD


By: */s/ Anne M. Brafford*
Anne M. Brafford

Attorneys for Plaintiff Chris Kluwe


Dated:  July 28, 2025                                ACLU Foundation of Southern California


By: */s/ Peter Eliasberg*
Peter Eliasberg
Jonathan Markovitz

Attorneys for Plaintiff Chris Kluwe

Please be advised that the ACLU Foundation of Southern California represents Plaintiff Kluwe solely in connection with his First-Third Causes of Action asserted against the HBUHSD Defendants. The ACLU does not represent Plaintiff Kluwe in connection with the Fourth Cause of Action asserted against Defendant Epting.